**SIGNED THIS: February 26, 2010**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

In Re                          )
                               )     In Bankruptcy
RONALD L. GIBSON,              )
                               )     Case No. 04-71343
               Debtor.         )

## O P I N I O N

On March 22, 2004, Ronald Gibson, represented by Attorney John S. Narmont, filed a voluntary petition under Chapter 12 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Illinois. At that time, Mr. Gibson was not a resident of the Southern District of Illinois and, because the sunset provisions of Chapter 12 had taken effect, relief under Chapter 12 was not available. Unfortunately for both Mr. Gibson and Mr. Narmont, after its inauspicious start, this case continued

-1-

to be plagued with missteps and problems.  Now, almost six years after the initial filing and more than four years after the case was voluntarily dismissed, the relationship between Mr. Gibson and Mr. Narmont is the subject of litigation both before this Court and before the Illinois Attorney Registration and Disciplinary Commission ("ARDC").  For the reasons set forth below, this Court will address the remaining legal issues between Mr. Gibson and Mr. Narmont and will defer consideration of the professional and ethical issues to the ARDC.

From the documents filed in the case, including three applications for compensation with billing records attached filed by Mr. Narmont, a number of pertinent facts can be adduced.  Although the facts are involved and confusing in some respects, they are generally uncontested.

Mr. Gibson, along with his then wife Rosa Gibson, began meeting with Mr. Narmont regarding their financial problems in late 2003.  Mr. Narmont's billing records show several meetings with "clients" in December 2003.  The records also show preparation of pleadings for a dissolution of the Gibsons' marriage on December 23, 2003, and an appearance in state court on December 26, 2003, apparently for the entry of an order dissolving the Gibsons' marriage.  A billing statement attached to an application for compensation filed by Mr. Narmont on May 18, 2004, contains the following:  "NOTE:  Divorce charges included in Petition for Fees

-2-

as client had to dissolve marriage in order to file Chapter 12."

Notwithstanding his representation of Mr. Gibson in a divorce against Rosa Gibson in late 2003, Mr. Narmont proceeded to represent Rosa Gibson in the filing of a Chapter 7 case on March 31, 2004. Billing records show that Mr. Narmont also prepared "2 Wills" for the Gibsons on the same date as he prepared the dissolution of marriage pleadings.

As set forth above, Mr. Narmont represented Mr. Gibson in the filing of this case as a Chapter 12 case in the Southern District of Illinois on March 22, 2004. On that same date, Mr. Narmont filed a "Motion to Convert to Central District" stating that Mr. Gibson was a resident of Greene County, Illinois which is located in the Central District of Illinois. On March 23, 2004, then Chief Bankruptcy Judge Kenneth J. Meyers of the Southern District of Illinois reviewed the Motion to Convert and, construing it as a motion to transfer venue, entered an order transferring venue to the Central District of Illinois.

On April 13, 2004, Mr. Narmont filed a Motion to Convert Chapter 12 Case to Chapter 11. In this Motion to Convert, he acknowledged that Chapter 12 had not been extended by Congress and was not in effect at the time the case was filed. An order granting the Motion to Convert to Chapter 11 was entered on April 19, 2004. On October 15, 2004, a Motion to Convert to Chapter 12 was filed. The Motion to Convert to Chapter 12 included a

-3-

representation that Congress had finally acted to restore Chapter 12 and that the restoration was retroactive to January 1, 2004.[1] An order converting the case back to Chapter 12 was entered November 3, 2004.[2]

Mr. Narmont filed an Application to Employ Attorney on March 30, 2004, and re-filed the same document on April 30, 2004. The Application to Employ did not include the separate verified statement required by Bankruptcy Rule 2014 but did include a

---

[1]

Chapter 12 was originally enacted in 1986 and contained a seven-year sunset provision. *See* Bankruptcy Judges, United States Trustee and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, §255, 100 Stat. 3088, 3105. After the initial seven years, Chapter 12 was extended several times and, in 2003, Chapter 12 was further extended until January 1, 2004. *See* Family Farmer Bankruptcy Relief Act of 2003, Pub. L. No. 108-73, §2(a), 177 Stat. 891 (Aug. 15, 2003). Chapter 12 actually expired on January 1, 2004, because it was not timely extended. Later in 2004, Chapter 12 was extended and the extension was made retroactive to January 1, 2004. *See* Family Farmer Bankruptcy Relief Act of 2004, Pub. L. No. 108-369, 118 Stat. 1749 (Oct. 10, 2004).

[2]

At the time of both conversions, a 20-day notice of a scheduled hearing or objection date was required. *See* Fed.R.Bankr.P. 2002(a)(4). No notice of either Motion to Convert was sent to creditors and neither Motion was set for hearing. Both Motions were simply granted by this Court's predecessor. Although this Court cannot say that either conversion would have been denied if proper notice had been given and hearings had been held, it does appear that at least some of Mr. Gibson's current complaints against Mr. Narmont stem from a lack of understanding of what was going on in his case. When the noticing practices of the Court and Clerk of the Court are inadequate or fail to comply with the Rules, attorneys should step forward to protect the interests of their own clients and complete the proper noticing themselves. *See* In re Stassi, 2009 WL 3785570 *at* *3 (Bankr. C.D. Ill. Nov. 12, 2009).

representation that "[t]o the best of the Debtor's knowledge, said attorney has no connection with the creditors, or any other party in interest, or his (sic) respective attorneys and accountants, or the United States trustee."  The Application to Employ did not disclose Mr. Narmont's simultaneous representation of Mr. Gibson's ex-wife.[3]  Because an objection date of May 5, 2004, had been noticed with respect to the original Application to Employ and no objections had been filed, an order allowing the employment of Mr. Narmont was entered on May 10, 2004.  That order, drafted by Mr. Narmont, specifically provided that all of his fees were subject to court approval.

Three requests for compensation were filed by Mr. Narmont during the pendency of this case.  The first was captioned as a Petition for Approval of Attorneys Fees ("First Fee Request") and was filed on May 18, 2004.  This First Fee Request contained an itemization of time expended from December 19, 2003, through April 30, 2004, and requested approval of $3912.75 in fees and costs. The costs included a $100 charge for the "preparation of 2 Wills" in December 2003.  The First Fee Request disclosed that a retainer

---

[3]      The Application to Employ was not the only document filed in this case which failed to make required disclosures relating to Mrs. Gibson and the divorce.  Question 4 of the Statement of Financial Affairs requires the disclosure of "all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing..."  Mr. Gibson's Statement of Financial Affairs - prepared and filed by Mr. Narmont - did not disclose the Gibson dissolution proceeding.

of $10,239 had been paid and asked that allowed fees and expenses be offset against that retainer. Hearing on the First Fee Request was set for June 8, 2004, and, when no objections were raised at that hearing, an order was entered allowing the requested compensation in the amount of $3912.75.

A second request for compensation captioned as Application for Approval of Attorney's Fees and Expenses ("Second Fee Request") was filed by Mr. Narmont on December 1, 2004. Attached to the Second Fee Request are several billing statements, each of which is dated November 22, 2004. The statements appear, however, to be for various periods of time commencing in December 2003 and ending in November 2004. Some of the statements are billings to Ronald and Rosa Gibson, while others are billings only to Ronald Gibson.

The first page of the billing statements attached to the Second Fee Request provides an itemization of time for December 2003 and includes charges similar to those shown on the First Fee Request for the same time period. Also on the December 2003 bill, however, is a $610 charge for the fees and costs for Rosa Gibson's Chapter 7 case.

The final billing statement attached to the Second Fee Request is a cumulative statement running from December 19, 2003, through November 16, 2004, and claims attorney fees and costs in the amount of $13,233.25. This statement shows that, after application of the $10,239 retainer paid in December 2003, a balance of $2994.25 was

-6-

due.   Because $3912.75 of the fees and costs had previously been approved, the Second Fee Request should have sought approval for the additional $9320.50 included in the Second Fee Request. Inexplicably, in the narrative portion of the Second Fee Request, approval of only $8560.50 in additional fees and costs was requested.

The Second Fee Request was set for hearing on December 14, 2004.   Again, in the absence of objection, the Second Fee Request was allowed.   An order was entered on December 15, 2004, allowing the requested fees and costs in the amount of $8560.50.

Another request for compensation was made by Mr. Narmont on April 27, 2005, by the filing of a Petition for Approval of Attorney's Fees ("Third Fee Request").   Attached to the Third Fee Request was an itemized statement for the period December 19, 2003, through April 12, 2005.   The Third Fee Request claimed fees and costs in the amount of $17,202.   The Third Fee Request showed application of the $10,239 payment made in December 2003, resulting in a balance due of $6963.   Mr. Narmont sought allowance of the entire $6963 in his Third Fee Request even though a portion of those fees and costs had already been approved in the Second Fee Request.   The Third Fee Request was set for hearing on May 3, 2005, and, again, in the absence of objection, an order was entered

allowing the requested fees and costs in the amount of $6963.[4]

A Chapter 12 Plan ("Plan") was filed by Mr. Gibson on January 31, 2005.  The Plan was confirmed by order entered April 8, 2005.  The Plan provided for the restructuring of Mr. Gibson's secured debts, payment of minimal amounts to his unsecured creditors, and payment in full of administrative expenses including "attorney fees and court costs."  The Plan provided that the funding for Plan payments would principally come from government payments Mr. Gibson was receiving with respect to real estate owned by him.

Although from outward appearances Mr. Gibson seemed to be on the right track to reorganization by April 2005, behind the scenes, disputes had arisen between Mr. Gibson and Mr. Narmont.  Mr. Gibson and his daughter, Carla Haydon, now assert that, in early April 2005, they had a meeting with Mr. Narmont regarding the funding of

---

[4]     At the time each of the fee applications was filed, a 20-day notice of a scheduled hearing or objection date was required.  *See* Fed.R.Bankr.P. 2002(a)(6).  Thus, the hearing dates for both the Second Fee Request and the Third Fee Request did not comply with the Rules.  The scheduling of the Third Fee Request is particularly troubling because the Third Fee Request was filed on April 27, 2005, which was a Wednesday, and the hearing was set for May 3, 2005, which was the next Tuesday.  The docket shows that the Clerk of Court mailed notice of the scheduled hearing on April 28, 2005, which means that, at the earliest, Mr. Gibson may have received actual notice of the hearing on Friday, April 29th but, quite possibly, did not receive notice at all before the hearing.  This Court cannot now say that its predecessor would have ruled differently on the Third Fee Request if proper notice had been given.  It does appear, however, that one of Mr. Gibson's complaints against Mr. Narmont now relates to these specific fees and, based on the filings of both parties, it is clear that there was some dispute about the fees at the time they were requested by Mr. Narmont.

Mr. Gibson's Plan.   At that meeting, which according to Mr.
Narmont's billing records occurred on April 7, 2005, Mr. Narmont
presented Mrs. Haydon and her husband with documents which
transferred to them the beneficial interest in the land trust which
held title to Mr. Gibson's real estate.[5]   In exchange for this
transfer, Mr. and Mrs. Haydon intended to commit to make the
monthly payments on Mr. Gibson's Plan.   While reviewing the
documents, however, the Haydons noticed that Mr. Narmont had
included a provision obligating the Haydons to pay him $6350 in
additional attorney fees.   The Haydons objected to such payment
because they had advanced $10,000 of the original retainer and had
understood that amount to be a flat fee to cover all of the
services to be rendered by Mr. Narmont.[6]

---

[5]   Mr. Narmont's First Fee Request discloses that, in December
2003, when he first met with the Gibsons and was preparing the
dissolution of marriage pleadings, he also prepared a land trust
agreement and warranty deed into trust.   He admits that he advised
the Gibsons to convey their real estate into a land trust at United
Community Bank.   The real estate transfer was not, however,
disclosed on the Statement of Financial Affairs prepared by Mr.
Narmont and filed in either of the Gibsons' cases.   The fees for
the preparation of these documents were charged on the First Fee
Request.

[6]   Mr. Narmont's First Fee Request discloses that he prepared a
"Promissory Note and Real Estate Mortgage" in December 2003 and
charged the fees for the preparation of those documents to this
case.   Carla Haydon and her husband advanced $10,000 for Mr.
Narmont's retainer, and it appears that the note and mortgage were
created to memorialize that transaction and secure the debt of the
Gibsons to their daughter and son-in-law with their real estate.
The confirmed Plan proposes payments to Karla (sic) Haydon on a
secured debt in the amount of $10,000.

The record is somewhat unclear about exactly what occurred after the April meeting. Apparently, Mr. Gibson and Mrs. Haydon exchanged some additional correspondence with Mr. Narmont and may have had some further meetings with him over the course of the next several months. Mr. Gibson and Mrs. Haydon were complaining that Mr. Gibson was not and had never been a farmer, and that Mr. Narmont had recommended a Chapter 12 filing and the divorce to create eligibility for Chapter 12 in order to run up his fees without providing any real benefit to Mr. Gibson. They were also complaining that Mr. Narmont knew Chapter 12 did not exist when he filed the case and that the multiple conversions had resulted in thousands of dollars in fees and costs which could have been avoided if Mr. Narmont had given them correct legal advice at the time of their first meeting.

After apparently not getting any satisfaction from his conversations and correspondence with Mr. Narmont, Mr. Gibson filed a Motion to Dismiss this case on July 7, 2005. The case was then dismissed by order entered July 11, 2005.[7] After the case was dismissed and the order of dismissal docketed, Mr. Narmont filed another Motion to Dismiss. Prior to taking the action requested by

---

[7]     No notice of the Motion to Dismiss was provided to anyone before this Court's predecessor granted the Motion. Because this case had previously been converted, Mr. Gibson did not have an absolute right to dismiss without notice or hearing. 11 U.S.C. §1208(b). A 20-day notice was required at the time. Fed.R.Bankr.P. 2002(a)(4).

Mr. Gibson to dismiss the case, however, Mr. Narmont filed a Memorandum of Judgment with the Greene County, Illinois Recorder. The Memorandum of Judgment, filed July 5, 2005, represented that Mr. Narmont had a judgment against Mr. Gibson and his former wife, Rosa Gibson, in the amount of $8560. Attached to the Memorandum of Judgment was a copy of the order entered December 15, 2004, allowing fees and costs in that amount.

On September 29, 2008, Mr. Gibson and Mrs. Haydon filed correspondence with this Court complaining that Mr. Narmont had created a lien on Mr. Gibson's real estate and asking for assistance of this Court in removing the lien. Attached to the correspondence was the Memorandum of Judgment filed on July 5, 2005, and copies of letters that Mr. Gibson, Mrs. Haydon, and Mr. Narmont had submitted to the ARDC with respect to Mr. Gibson's request to the ARDC to investigate Mr. Narmont's conduct in this case.

This Court initially construed the correspondence from Mr. Gibson and Mrs. Haydon as a motion to reopen the case and as a motion to avoid a lien. The case was reopened, and a hearing was set for October 21, 2008, on the request to avoid the lien. Prior to the hearing, Mr. Narmont filed a response wherein he admitted that the $8560 amount included in the Memorandum of Judgment was not an accurate statement of the amount due to him at the time the Memorandum of Judgment was filed, and admitted that the Memorandum

-11-

of Judgment needed to be released because it had been filed "prior to the case being completed."  Mr. Narmont represented that the lien had been released.

At the hearing held on October 21, 2008, this Court advised Mr. Narmont that the correspondence from Mr. Gibson and Mrs. Haydon appeared to seek not only the release of the lien, but also sanctions against Mr. Narmont for his conduct.[8]  This Court stated that the correspondence raised issues of whether Mr. Narmont had violated the automatic stay and had used an order which was not intended to be a money judgment to create an improper lien.  Mr. Gibson and Mrs. Haydon, appearing *pro se*, represented to the court that Mr. Narmont had not, in fact, released the lien despite his promises to do so.  Mr. Narmont repeated his promise that the lien was being released.  Mr. Narmont also asserted that, because Mr. Gibson's real estate was titled in a land trust, the Memorandum of

---

[8]     It is not unusual for *pro se* filings to be made in the form of correspondence.  The docketing and noticing of such filings can be problematic for the Court and Clerk's office staff.  The docket and hearing notice for such filings may - and perhaps in many cases should - simply say "correspondence."  However, the specific relief sought in a filing often controls the extent and type of notice which must be sent and also determines whether a fee is due for the filing.  *See* Fed.R.Bankr.P. 2002; 28 U.S.C. §1930.  Thus, there is often reason for correspondence to be characterized by the Court or the Clerk as a particular type of motion based on the relief which appears to be requested. The caption of a filing is not, however, fully determinative of the relief which may be requested or allowed after hearing.  Accordingly, lawyers would generally be advised to thoroughly review all filings and not to simply rely on the caption of a filing in preparing to respond to that filing.

Judgment did not create a lien on the property and, therefore, even if the lien was improperly filed, Mr. Gibson was not damaged. The Court took the matters raised by the correspondence and the arguments under advisement.

On November 5, 2008, this Court entered an order finding that Mr. Narmont's filing of the Memorandum of Judgment violated the automatic stay and the terms of the confirmed Chapter 12 Plan. The Court also found that the various orders entered in the case allowing Mr. Narmont's fees were not money judgments which could support the filing of the Memorandum of Judgment. This Court found Mr. Narmont to be in indirect civil contempt and ordered him to purge himself by fully releasing the Memorandum of Judgment and ceasing and desisting from attempting to use the fee orders to create liens on Mr. Gibson's property. Because Mr. Gibson claimed no monetary damages resulting from Mr. Narmont's conduct, none were awarded.

Mr. Narmont filed a Notice of Appeal with respect to this Court's November 5th order. Before the District Court, Mr. Narmont argued that he had been surprised by this Court's comments at the October 21st hearing and that he had not been given proper notice and an opportunity to prepare a defense against the allegations that he should be sanctioned. On May 15, 2009, the District Court entered an order finding that Mr. Narmont had not received adequate notice of the request for sanctions and remanding the case for

-13-

further proceedings before this Court to give Mr. Narmont a full
opportunity to present further evidence and arguments on the
issues.  <u>In re Gibson</u>, 2009 WL 1393289 (C.D. Ill. May 15, 2009).

On June 15, 2009, this Court entered an order advising Mr.
Narmont that the correspondence from Mr. Gibson raised issues
regarding whether Mr. Narmont violated the automatic stay and the
terms of the confirmed Plan.  Mr. Narmont was also advised that the
correspondence sought the relief of having Mr. Narmont held in
contempt and sanctioned.  The order provided both parties the
opportunity to request an evidentiary hearing if either believed
that any material facts were in dispute.  Neither party requested
an evidentiary hearing.  The order also set a briefing schedule for
written arguments.  With all written arguments having been
submitted, the issues raised by the correspondence from Mr. Gibson
and Mrs. Haydon are now ready for decision.

The issues before the court are whether Mr. Narmont's filing
of the Memorandum of Judgment violated the automatic stay, whether
Mr. Narmont's filing of the Memorandum of Judgment violated the
terms of the confirmed Plan, whether the several fee orders that
were entered constituted money judgments against Mr. Gibson, and
whether there is any reason to sanction Mr. Narmont further in view
of the fact that he has now fully released the Memorandum of
Judgment.

-14-

I.   **Filing the Memorandum of Judgment Violated the Automatic Stay.**

An automatic stay came into effect with the filing of the petition on March 22, 2004.[9]  11 U.S.C. §362(a).  The stay remained in effect as to the property of the estate until the property was no longer property of the estate.  11 U.S.C. §362(c)(1).  The stay remained in effect as to all other prohibited acts against the debtor until the case was dismissed on July 11, 2005.  11 U.S.C. §362(c)(2).

Mr. Narmont argues that his filing of the Memorandum of Judgment did not violate the automatic stay because, upon confirmation of the Plan, the property of the estate revested in the Debtor, Mr. Gibson, and, therefore, the property against which the Memorandum of Judgment was filed was no longer subject to the protection of the stay.  *See* 11 U.S.C. §1227(b); 11 U.S.C.

---

[9]

Section 301 provides that a voluntary case "under a chapter of this title" is commenced by the filing of a petition "under such chapter."  11 U.S.C. §301(a).  A petition filed under §301 operates as a stay.  11 U.S.C. §362(a).  Although this Court has stated the general rule that an automatic stay comes into effect with the filing of a petition, a question might well be raised as to the legal effect of filing a petition "under a chapter" which was not available at the time.  A full discussion of the potential problems involved in filing under a chapter which was not available is beyond the scope of this Opinion.  Further, because Mr. Narmont filed the case under the unavailable chapter and most certainly represented to Mr. Gibson that he was protected by the automatic stay by that filing, Mr. Narmont should not be allowed to escape the consequences of his conduct based on this technical issue.  He has not raised this issue, and the Court will not explore it for him.

§362(c)(1);   In re Eden, 2003 WL 21147830 at *3 (N.D. Ill. May 14, 2003) (construing the parallel provision of Chapter 13 - §1327).

Mr. Narmont's argument misses the mark for several reasons. First, by his own admission, Mr. Narmont's acts were not just against Mr. Gibson's property but against Mr. Gibson himself.  Mr. Narmont asserts that, because Mr. Gibson's real estate had been conveyed into a land trust before the case was filed, the filing of a Memorandum of Judgment did not create a lien against the real estate.  That is true.  The Memorandum of Judgment would have created a lien only against real estate actually titled in Mr. Gibson's name.  See 735 ILCS §5/12-101.  But, if Mr. Narmont's intent in filing the Memorandum of Judgment was not to create a lien on Mr. Gibson's real estate - and he says it was not - then his intent must have been to assert some leverage against Mr. Gibson personally to pay the amount claimed due.  This Court previously found that there was no reason other than the creation of a lien for Mr. Narmont to have filed the Memorandum of Judgment, but Mr. Narmont vigorously denies that was his intent.  If that is true, then the only other possible reason would have been to pressure Mr. Gibson personally.

The Memorandum of Judgment was based on the December 2004 fee award which included pre-petition charges.  The award included $610 which, according to the Second Fee Request, was charged in December 2003 for Rosa Gibson's Chapter 7 case.  Because the sum referred to

-16-

in the Memorandum of Judgment specifically included the pre-petition charges for Mrs. Gibson's case, the filing of the Memorandum of Judgment violated the stay's prohibition of acts against a debtor to recover claims that arose before the commencement of the case. *See* 11 U.S.C. §362(a)(1). Mr. Narmont's admission now that most of the December 2004 award was covered by the retainer, and, therefore, was not even owed at the time he filed the Memorandum of Judgment, is not a mitigating factor which would avoid a finding that he violated the stay. To the contrary, it is an aggravating factor. Neither of the Gibsons ever owed Mr. Narmont a debt of $8560, and there never was any basis to take any collection actions against the Gibsons for that amount. Nevertheless, Mr. Narmont attempted to collect the $8560, which included some pre-petition charges and, in doing so, violated the stay.

Second, although the stay generally terminates with respect to property of the estate when a plan is confirmed and estate property revests in a debtor, to the extent that estate property is necessary to fulfill the terms of a confirmed plan, the stay remains in effect to protect that property interest. *See* Matter of Heath, 115 F.3d 521, 524 (7th Cir. 1997) (construing the parallel provision of Chapter 13 - §1327). Here, the Plan was to be funded with income from the real estate which came in the form of government payments. Mr. Gibson did not have excess income over

-17-

and above the amounts necessary to fund his Plan.  To the contrary,
Mr. Narmont had drafted documents so that Mr. Gibson's daughter and
son-in-law would help to make the Plan payments.  The filing of the
Memorandum of Judgment appears to have been the first step - albeit
a misstep - in exercising rights against the property which might
ultimately have disrupted the cash flow from the property.
Although Mr. Narmont denies that intent, in the absence of a clear
statement from him of what his intent was, the potential
consequences of his acts must be assumed to have been within his
intent.  The stay was in effect as to the income earned from the
real estate to the extent necessary to fund the Plan, and the
record indicates that all income from the property was necessary to
fund the Plan.  Because Mr. Narmont's acts against that real estate
could have disrupted that income stream, the acts violated the
stay.

As a fall-back position, Mr. Narmont asserts that, even if his
conduct violated the stay, neither a finding of contempt nor the
issuance of sanctions is a proper remedy for stay violations.
Relying on In re Rimsat, Ltd., 208 B.R. 910 (Bankr. N.D. Ind.
1997), he argues that, because the automatic stay is based on
statute rather than upon the issuance of a specific written order,
contempt and sanctions are not available remedies.[10]  Rimsat does

---

[10]

It is questionable whether Mr. Narmont actually believes that
sanctions are not an available remedy when the stay is violated.
Mr. Narmont appeared before this Court as recently as January 26,

hold that a civil contempt proceeding with its heightened standard of proof - clear and convincing - is not required to prosecute a stay violation.  Id. at 912.  Rimsat does not, however, hold that violating the stay is not sanctionable conduct.

In making the argument that he cannot be sanctioned for violating the stay, Mr. Narmont ignores §362(k) which specifically provides for the issuance of sanctions for stay violations.  11 U.S.C. §362(k).  Further, he ignores Seventh Circuit case law which clearly states that contempt proceedings and the issuance of sanctions are appropriate remedies for stay violations. *See, e.g.,* Randolph v. IMBS, Inc., 368 F.3d 726, 728 (7th Cir. 2004) (Easterbrook, J.) (a debtor dunned after filing bankruptcy may ask the bankruptcy judge to hold the other party in contempt of either the automatic stay or the discharge injunction); Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1376 (7th Cir. 1992) (Posner, J.) (violation of the automatic stay exposes the violator to contempt proceedings).

Mr. Narmont violated the stay because his filing of the Memorandum of Judgment was an attempt to collect a pre-petition debt from Mr. Gibson and an attempt to disrupt the cash flow needed to fund the confirmed Plan.  Mr. Narmont was aware of the

---

2010, seeking sanctions against a bank for stay violations on behalf of a client, James T. Cunningham (#09-71018).  When questioned about whether his position in that case contradicted the position he had taken here, Mr. Narmont insisted that sanctions should be imposed when the stay is violated.

bankruptcy case and the existence of the stay and, therefore, his conduct was willful and without justification.  *See* <u>In re Betts</u>, 165 B.R. 233, 242 (Bankr. N.D. Ill. 1994); <u>In re Welch</u>, 296 B.R. 170, 172 (Bankr. C.D. Ill. 2003).  Sanctions may issue for such conduct.

II.  **Filing the Memorandum of Judgment Violated the Terms of Confirmed Plan.**

Mr. Gibson's confirmed Plan provided for the payment of administrative expense claims and specifically included in those claims "attorneys fees and court costs."  Mr. Narmont now argues, however, that his fees were not provided for in the Plan and that he was not bound by the terms of the confirmed Plan.  On the issue of whether the Plan provided for his fees, Mr. Narmont's denial that the Plan included a provision for his fees is simply wrong. In a provision labeled "V. Treatment of Claims", specific reference is made to claims for "attorney fees and costs" and provides that such claims will be paid in full as administrative expenses.

Mr. Narmont is also wrong in his denial that he was not bound by the terms of the Plan.  Mr. Narmont bases his argument in large measure on the definition of a "creditor" found in the Bankruptcy Code.  *See* 11 U.S.C. §101(10).  Because Mr. Narmont believes that only creditors are bound by the terms of a confirmed plan, and because he asserts that he is not a creditor as that term is

-20-

defined by the Code, he reasons that he was not bound by the terms of the Plan.

Whether Mr. Narmont was a creditor is not entirely clear. Creditors are generally defined as those with pre-petition claims against a debtor.  11 U.S.C. §101(10)(A).  Mr. Narmont's various fee applications do not clearly establish whether he had applied the $10,239 retainer in full when it was received in December 2003 and, therefore, was carrying a credit balance owed to Mr. Gibson or whether he was holding the retainer in trust until fees were approved.  Thus, it is not clear whether he was a pre-petition creditor with amounts due to him when this case was filed.  What is clear, however, is that the $8560 December 2004 fee award included amounts which were charged pre-petition.  Thus, the filing of the Memorandum of Judgment using the $8560 fee award clearly was an attempt to collect, at least in part, a pre-petition debt.  The fact that, by the time the Memorandum of Judgment was filed, the bulk of the $8560 had been paid by application of the retainer is not a mitigating factor.  Rather, as set forth above, it is an aggravating factor.  Not only did the $8560 award include pre-petition amounts, it was substantially paid by the retainer. Nevertheless, Mr. Narmont made an attempt to collect the entire $8560 by filing the Memorandum of Judgment, and that action violated the terms of the confirmed Plan.

Further, even if Mr. Narmont was not a pre-petition creditor,

he was bound by the terms of the confirmed Plan. Section 1227(a) provides that the terms of a confirmed plan bind the debtor and each creditor. 11 U.S.C. §1227(a). Mr. Gibson's Plan had a more inclusive provision, however, and stated that the Plan, once confirmed, would bind the debtor, creditors, and all parties in interest. Even if Mr. Narmont was not technically a creditor, he was a party in interest.

The term "party in interest" is not defined in the Code but has been defined by case law as a person "whose pecuniary interests are directly affected by the bankruptcy proceedings." In re Torres Martinez, 397 B.R. 158, 164 (1st Cir. BAP 2008), quoting In re Davis, 239 B.R. 573, 579 (10th Cir. BAP 1999). Anyone who has a practical stake in the outcome of a case is a party in interest. In re Sobczak, 369 B.R. 512, 518 (9th Cir. BAP 2007), relying on In re Amatex Corp., 755 F.2d 1034, 1041-44 (3rd Cir. 1985).

Mr. Narmont clearly had a stake in the outcome of the case. Mr. Narmont was employed pursuant to an order which provided that all of his fees would be subject to court approval. See 11 U.S.C. §327. He applied for interim compensation on three occasions. See 11 U.S.C. §330; 11 U.S.C. §331. Professional fees allowed to a debtor's attorney may be treated as administrative expense claims and given priority treatment in a plan. See 11 U.S.C. §503(b)(2); 11 U.S.C. §507(a)(2); 11 U.S.C. §1222(a)(2). By the time the Plan was confirmed, Mr. Narmont claimed to be owed more than $6000 not

-22-

covered by the original retainer.  He drafted the language in the Plan that provided for the payment of his fees as an administrative expense, and he drafted the language in the Plan that bound all parties in interest to the terms of that Plan.  His assertion now that he could collect his fee without regard to the terms of the confirmed Plan is simply contradictory to both the law and the facts of this case.  He was bound by the terms of the confirmed Plan, and his conduct in filing the Memorandum of Judgment violated the terms of the confirmed Plan.

### III. **Fee Orders Entered in this Case Are Not Money Judgments.**

A memorandum of judgment is a collection tool under Illinois law.  The filing of a memorandum of judgment evidences the existence of a final money judgment upon which execution may issue and creates a lien on all real property titled in the name of the judgment debtor in the county of recording.  735 ILCS §5/12-101; Dunn v. Thompson, 174 Ill.App.3d 944, 947, 529 N.E.2d 297, 299, 124 Ill. Dec. 477, 479 (1988).  Final orders of federal courts may support the filing of a memorandum of judgment.  Federal court orders are final judgments if they are appealable.  Fed.R.Civ.P. 54(a); Fed.R.Bankr.P. 9001(7).  The orders entered on the several fee applications of Mr. Narmont were not final money judgments sufficient to support a memorandum of judgment.

Whenever an attorney represents a debtor in a bankruptcy case,

-23-

the attorney must file a disclosure of the compensation that the attorney has been paid or that the attorney has agreed to accept for the representation.   11 U.S.C. §329; Fed.R.Bankr.P. 2016(b).  The Rule 2016(b) disclosure is an attorney's representation to the court of his agreement with his own client and forms the basis for any award of fees which may later be made.  *See* <u>In re Jackson</u>, 401 B.R. 333, 340-41 (Bankr. N.D. Ill. 2009); <u>In re Kowalski</u>, 402 B.R. 843, 848 (Bankr. N.D. Ill. 2009).   Courts generally cannot award fees which exceed the amounts that the attorney agreed to accept and the client agreed to pay.   Courts are, however, required to review fee applications to determine the reasonable value of services provided and may cancel fee agreements and order the disgorgement of excessive fees. 11 U.S.C. §329(b); 11 U.S.C. §330(a)(3).

Here, Mr. Narmont filed a Rule 2016(b) disclosure indicating that he had received a $10,239 retainer and that additional fees would be billed "at the regular hourly rate."   Although his three fee applications were captioned in slightly different ways, each suggested that the fees sought were based on Mr. Narmont's agreement with his client previously disclosed to the Court, and each contained a specific representation in the prayer portion of the application that approval of the fees was requested by both Mr. Narmont and the Debtor, Mr. Gibson.   Each of the orders entered on the fee applications allows the fees requested, but none of the orders purports to enter judgment or contains any language which

-24-

could be construed as ordering Mr. Gibson to pay any particular amount to Mr. Narmont.

It is undisputed that, when the First Fee Request and the Second Fee Request were allowed, the amount Mr. Narmont had received as a retainer was available to cover virtually all of the allowed fees. The orders allowing the First Fee Request and Second Fee Request could never have been intended to be money judgments because Mr. Narmont had the funds on hand to pay almost all the fees allowed. There would have been no reason to enter a money judgment against Mr. Gibson for amounts which he had already prepaid. Likewise, the Third Fee Request sought approval for the payment of fees which were already provided for in the confirmed Plan, and no reason would have existed to enter a money judgment for those fees. As set forth above, the orders do not contain language ordering that a specific amount of money is due to one party from another. Rather, each order simply approves the payment of fees which were represented to be agreed to by the parties.[11]

---

[11]   Mr. Narmont attached to his recent filings a fee order and a memorandum of judgment from each of two different old cases - Krueger (00-70999) and Otto (99-72763). The fee orders and memoranda of judgment bear the stamped signature of this Court's predecessor. Mr. Narmont argues that, because the signature of Judge Larry Lessen is stamped on each memorandum of judgment, Judge Lessen must have thought that each corresponding fee order was a final money judgment and, accordingly, this Court should come to the same conclusion. A close review of the documents, however, shows that they undercut rather than support Mr. Narmont's position. Each fee order recites that it is a "Judgment" which is being rendered against the specific debtors by name for a specific amount. The circumstances of why this type of order was used in

Further, each of the orders allowing the fee applications was an interim order which was subject to further review and modification by the Court.  *See* 11 U.S.C. §331; Matter of Taxman Clothing Co., 49 F.3d 310, 312 (7th Cir. 1995) (all interim awards of fees in bankruptcy cases are tentative and therefore revisable until the end of the case); In re Hadley, 2007 WL 1832037 *at* *9-11 (C.D. Ill. Jun. 25, 2007) (even if fee order refers to §330 rather §331, the fee award is interim and not final unless it is not subject to further adjustment).  This case was ongoing and nothing in any of the fee applications, including the Third Fee Request, indicated that a final, appealable order was requested.  Mr. Narmont does not dispute that all of the fee orders were interim orders.  However, he argues that, once the case was dismissed, the fee orders became final.  That does not help Mr. Narmont with respect to the matter directly before this Court because he has admitted that, when he filed the Memorandum of Judgment, he relied on an interim order which was not an order upon which execution could issue.  Thus, he misrepresented in the Memorandum of Judgment that he had a final judgment against the Gibsons for the amount claimed.

Mr. Narmont is also wrong in his assertion that, when the case

---

each of these two cases are unknown to this Court.  What is apparent, however, is that Mr. Narmont knows how to draft a final money judgment order when it is appropriate to do so and knows how to draft an order simply allowing compensation to be paid when only that more limited relief is appropriate.  The Gibson fee orders are of the latter type.

was dismissed, the fee orders became final money judgments.  As set forth above, the orders were never money judgments because they did not contain the requisite judgment language and, more importantly, the filings upon which the orders were based sought only approval of the fees requested and not money judgments.  The issue is not whether, upon dismissal, there was finality to the orders, but whether the orders were ever intended to represent judgments obligating Mr. Gibson to pay fixed sums to Mr. Narmont.  They were not intended as such because no motions or applications were filed by Mr. Narmont seeking such relief.

Final fee orders require consideration of the results obtained in a case and the nature and value of the services rendered.  11 U.S.C. §330(a)(3).  In a case such as this, upon dismissal prior to completion of the plan, there would be no need to make that final value analysis because there would be no reason to make a final award of fees.  Under such circumstances, the interim orders do not rise to the "dignity or level of a money judgment."  In re Fairway Missionary Baptist Church, 131 B.R. 407, 409 (Bankr. W.D. Tenn. 1991).

Because all of the fee orders here were interim and none of them was appealable, none was a judgment which could support execution or other collections activities.  Id. at 409-10; Fed.R.Bankr.P. 9001(7).

-27-

IV. **Because the Complained of Conduct Has Been Remedied, No Further Relief Will Be Granted**.

As set forth above, Mr. Narmont filed the Memorandum of Judgment claiming that he held an $8560 judgment against both Ronald and Rosa Gibson on July 5, 2005. The Memorandum of Judgment was filed as document number 136838 in the office of the Greene County Recorder. After Mr. Gibson complained to the ARDC in May 2008, Mr. Narmont filed another document with the Greene County Recorder captioned "Partial Release of Amount of Judgment Lien." The document recites that the lien as recorded in Document 136838 is reduced "from $8560.50 down to $6963." The Partial Release was filed as document 145956 on June 21, 2008.

After this Court scheduled a hearing on Mr. Gibson's correspondence, Mr. Narmont filed another document with the Greene County Recorder which was labeled "Release of Memorandum of Judgment." This Release purports to have been signed by Mr. Narmont on October 16, 2008, and bears a file stamp dated October 21, 2008, which was the date of the hearing before this Court. The Release says that it releases a memorandum of judgment but refers only to document 145956 which was the Partial Release.

Although Mr. Narmont represented at the October 21st hearing that he had released - or was in the process of releasing - the Memorandum of Judgment, Mr. Gibson continued to complain to this Court that the document filed by Mr. Narmont on October 21st was

-28-

ineffective to accomplish that goal.  Finally, on November 8, 2008, after this Court had entered its Order finding Mr. Narmont in contempt and ordering him to release the Memorandum of Judgment, Mr. Narmont sent another "Release of Memorandum of Judgment" to the Greene County Recorder which effectively released the original Memorandum of Judgment by specifically referring to document 136838.

The purpose of civil contempt proceedings is generally to be coercive or remedial.  Jones v. Lincoln Electric Co., 188 F.3d 709, 738 (7th Cir. 1999), cert. denied 529 U.S. 1067, 120 S.Ct. 1673, 146 L.Ed.2d 482 (2000).  Here, the requested relief was removal of the Memorandum of Judgment, and this Court's Order of November 5, 2008, resulted in Mr. Narmont finally releasing that wrongfully filed document.  Mr. Gibson's complaints were based on violations of the stay and the terms of the confirmed Plan, and those complaints supported an order sanctioning Mr. Narmont and ordering him to release the Memorandum of Judgment.  Because Mr. Narmont has now fully complied with that Order, however, no further relief is warranted.

Because this Court's November 5th Order was reversed and the matters remanded, another order must be entered to formally conclude the pending matters.  Accordingly, Mr. Gibson's Motion to Avoid Lien will be denied as moot because the relief requested therein has been provided and no further remedy is appropriate at this time.  The denial will, however, be without prejudice.  Resolution of the

-29-

professional and ethical issues raised by Mr. Narmont's conduct detailed herein is deferred to the ARDC.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###